# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| MERRITT ISLAND WOODWERX LLC and TRUE TOUCH SERVICES LLC, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY DEMAND** |
| SPACE COAST CREDIT UNION, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Merritt Island Woodwerx LLC and Plaintiff True Touch Services LLC ("Plaintiff") bring this Class Action Complaint against Defendant Space Coast Credit Union ("Defendant"), and allege as follows:

## INTRODUCTION

1. This case concerns Defendant's unlawful business practice of assessing $30 overdraft fees on debit card transactions authorized on sufficient funds and $30 fees where another fee (not a transaction) overdraws the account.

2. These practices breach promises made in Defendant's adhesion contract, comprised of the Membership Agreement and Disclosure, Ex. 1 hereto; the Fee Schedule, Ex. 2 hereto; and the Overdraft Opt-In, Ex. 3 hereto (collectively, the "Contract").

3.     The Contract purports to have an arbitration clause. Prior to the filing of this class action lawsuit, the sole member of Plaintiff Merritt Island Woodwerx LLC initiated an arbitration proceeding against Defendant for the assessment of improper fees on his account. Defendant refused to participate in that process and therefore the American Arbitration Association (AAA), the entity Defendant chose in its Contract, declined to administer because the arbitration because Defendant failed to comply with the AAA's policies regarding consumer claims. Ex. 4, AAA Refusal Letter.

4.     For this reason, Defendant has forced Plaintiffs to bring this action before this Court.

5.     Plaintiffs and other Defendant customers have been injured by Defendant's improper fee maximization practices. Plaintiffs, individually and on behalf of the classes of individuals preliminarily defined below, bring claims for Defendant's breach of contract, including the duty of good faith and fair dealing, unjust enrichment and violations of the Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 *et seq*.)).

## PARTIES

6.     Plaintiff Merritt Island Woodwerx LLC is a limited liability company formed under the law of Florida. Its principal place of business is in this District and its sole member, Joshua Bortherton, is a resident of this District. Plaintiff Merritt Island Woodwerx LLC has maintained a checking account at Defendant at all times relevant hereto.

7.    Plaintiff True Touch Services LLC is a limited liability company formed under the law of Florida. Its principal place of business is in Hiram, Georgia and it does business in this District. Its sole member, Wisler Delva, is a resident of Georgia. Plaintiff True Touch Services LLC has maintained a checking account at Defendant at all times relevant hereto.

8.    Defendant is a credit union with nearly $9 billion in assets. It is a Florida citizen with its principal place of business in this District. Defendant is engaged in the business of providing retail banking services, including in this District.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a State different from the Defendant. The number of members of the proposed Classes in aggregate exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

10.    This Court also has original jurisdiction under 28 U.S.C. §§ 1331 because this case involves a federal question as Plaintiffs allege violations of the Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 et seq.)).

11.    Furthermore, this Court has supplemental jurisdiction over Plaintiffs' claim for breach of contract, including breach of the duty of good faith and fair

dealing, because it is so related to Plaintiffs' claim for violations of the Electronic Fund Transfers Act (Regulation E) that it forms part of the same case or controversy under Article III of the United States Constitution.

12.     This Court has personal jurisdiction over the Defendant because it resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services, including in this District and in Florida.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District—where Defendant maintains its headquarters and where Plaintiffs conducted banking business with Defendant.

## **BACKGROUND FACTS**

14.     In 2021, the largest financial institutions in America charged customers almost $11 billion in overdraft fees. Customers who carried an average balance of less than $350 paid 84 percent of these fees. *Why Poverty Persists in America* (The New York Times, Mar. 9, 2023), https://www.nytimes.com/2023/03/09/magazine/poverty-by-america-matthew-desmond.html.

15.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R;

Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

16.    Federal regulators have also taken action. For example, the Consumer Financial Protection Bureau (CFPB) recently fined Regions Bank $191 million, finding that it "acted unfairly and abusively" in violation of the Consumer Financial Protection Act of 2010 by assessing the same "surprise" APSN fees at issue here. CFPB, Enforcement Actions, Regions Bank (Sep. 28, 2022), *available at* https://www.consumerfinance.gov/enforcement/actions/regions-bank_2022 (last accessed Mar. 22, 2023).

17.    In addition, the CFPB has concluded that charging APSN overdraft fees is an "unfair act[] or practice[]." Consumer Financial Protection Bureau, Mar. 2023, Supervisory Highlights Junk Fees Special Edition, Issue 29, Winter 2023, at 3 *available at* https://www.consumerfinance.gov/data-research/research-reports/supervisory-highlights-junk-fees-special-edition-issue-29-winter-2023/ (last accessed May 30, 2023). As a result of the APSN fee practice, the CFPB has "identified at least tens of millions of dollars of consumer injury and in response to these examination findings, institutions are providing redress to over 170,000 consumers." *Id*. at 4.

18.    Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I. DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS.

19.     Plaintiffs bring this action challenging Defendant's practice of charging Overdraft Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

20.     Defendant's practice is as follows: the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

21.     However, Defendant still assesses crippling $30 Overdraft Fees on many of these transactions and misrepresents its practices in the Contract.

22.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses Overdraft Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

23.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are

made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

24.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

25.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur Overdraft Fees due to the unavailability of the funds held for earlier debit card transactions.

26.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges Overdraft Fees on APSN Transactions.

27.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

28.    There is no justification for these practices, other than to maximize Defendant's Overdraft Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge Overdraft Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

29.    But Defendant was not content with these millions in Overdraft Fees. Instead, it sought millions more in Overdraft Fees on APSN Transactions.

30.    Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

### i.    Mechanics of a Debit Card Transaction

31.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

32.     At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

33.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

34.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

35.     There is no change—no impact whatsoever—to the available funds in an account when transfer step occurs.

### ii.    Defendant's Contract

36.     Plaintiffs have a Defendant checking account, which is currently governed by the Contract. Ex. 1-3.

37.     The Contract states that:

**13. OVERDRAFTS –**
**a. Payment of Overdrafts**. If, on any day, the available balance in your share or deposit account is not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below. The Credit Union's determination of an insufficient available account balance may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient available funds in order to pay an item. Your account may be subject to a charge for each item regardless of whether we pay or return the item.

...

For ATM and one-time debit card transactions, you must affirmatively consent to such coverage. Without your consent, the Credit Union may not authorize and pay an ATM or one-time debit card transaction that will result in insufficient funds in your account.

Ex. 1 at 6 (emphasis in original).

38.    In breach of these promises, Defendant assesses $30 Overdraft Fees when there are sufficient available funds to authorize and pay the full amount of the transaction.

39.    These promises also mean that Defendant will place holds on funds at the time of the authorization of a debit card transaction, which is when Plaintiffs pay the merchant, and that these holds reduce Plaintiffs' available balance, which is the balance that Defendant uses to determine OD Fees. *See* Ex. 1 at 7.

40.    Upon information and belief, Defendant further promises that authorization and payment occur simultaneously and that overdrafts will be determined at the time Defendant "authorize[s] and pay[s]" the debit card transaction. *See* Ex. 3 at 1, Ex. 1 at 6 (promising to "authorize and pay" overdrafts);

*see also id.* at 7 (linking payment to the time of authorization by referring to authorization as when "you present your card for payment").

41.    Defendant links payment to authorization several times in the Contract, meaning that transactions are paid, and therefore overdrafts are determined, at authorization.

42.    For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Defendant assesses Overdraft Fees on them anyway.

43.    The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APSN Transactions.

44.    In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

45.    All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

46.    The Contract also misconstrues Defendant's true debit card processing and overdraft practices.

47.    First, and most fundamentally, Defendant charges Overdraft Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

48.    Defendant's practice of charging Overdraft Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiffs to incur more Overdraft Fees than they should.

49.    Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

50.    Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

51.    Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

52.    At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an Overdraft Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

53.    Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the

hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

54.    This secret step allows Defendant to charge Overdraft Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

55.    In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

56.    Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

57.    Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed Overdraft Fees on APSN Transactions.

58.    Defendant and its accountholders make no such agreement. The Contract thus misleads and deceives account holders.

### iii.    Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

59.    Defendant's assessment of Overdraft Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they

cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

60.    Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

61.    Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

62.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

63.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an

ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

64.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

65.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.


[This space intentionally left blank.]

66.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



*Id.*

67.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

68.    Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiffs "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

69.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread

confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

70.     Despite this recommendation, Defendant continues to assess Overdraft Fees on transactions that are authorized on sufficient funds.

71.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

72.     Defendant was also aware of consumers' confusion regarding Overdraft Fees but nevertheless failed to make its customers agree to these practices.

### iv.     Plaintiffs Were Assessed an Overdraft Fee on Debit Card Transactions Previously Authorized on Sufficient Funds

#### *Plaintiff Merritt Island Woodwerx LLC*

73.     On October 23, 2019, November 11, 2019, December 28, 2019, January 28, 2020, May 26, 2020, November 6, 2020, November 13, 2020, November 14, 2020, November 19, 2020, March 18, 2021, April 20, 2021 and April 21, 2021, Plaintiff Merritt Island Woodwerx LLC was assessed $30 Overdraft Fees on debit card transactions, even though the transactions had been previously authorized on sufficient funds.

*Plaintiff True Touch Services LLC*

74.    On February 28, 2022, April 17, 2022, April 18, 2022, May 30, 2022, July 9, 2022, July 18, 2022, August 1, 2022, August 7, 2022, August 23, 2022, August 25, 2022 and August 26, 2022, Plaintiff True Touch Services LLC was assessed $30 Overdraft Fees on debit card transactions, even though the transactions had been previously authorized on sufficient funds.

75.    Because Defendant had previously held the funds to cover these transactions, the accounts of Plaintiffs always had sufficient funds to "cover" the transactions and should not have been assessed these fees.

76.    The improper fees charged by Defendant were also not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

77.    Plaintiffs therefore had no duty to report the fees as errors because they were not errors, but were part of the systematic and intentional assessment of fees according to Defendant standard practices.

78.    Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fees.

## II. DEFENDANT CHARGES OD FEES ON FEES THAT ARE NOT "TRANSACTIONS"

### A. Overview of Claim

79.    Plaintiff brings this action challenging Defendant's practice of charging $30 overdraft fees and/or NSF Fees on a third-party merchant's attempt to collect its own fee.

80.    When a third-party merchant requests payment of a fee, Defendant treats the merchant's fee as a separate transaction subject to its own $30 fee from Defendant.

81.    This results in punitive $30 fees that are 60 times larger than the third-party merchant fee itself, which was the case here.

82.    This is despite the fact that Defendant's accountholders never actually perform a separate consumer-initiated withdrawal or transaction; instead they are being charged fees by third-party merchants.

**B. The Contract**

83.    Defendant promises that fees may be assessed on a "check, draft, transaction, or other item," each of which is a consumer-initiated transaction. Ex. 1 at 6.

84.    For example, the contract states that fees may be assessed "per item" which occurs when "you write a check," when "you…authorize[]…an automatic bill payment" or when "you present your card for payment." Ex. 1 at 7.

85.    No "overdraft occurs" in connection with a merchant's attempt to collect a fee because the merchant's fee is not a consumer-initiated "item," "draft," "transaction," or "check" – just a third-party merchant's attempt to collect its own fee.

86.    Nor does the Fee Schedule give Defedant the right to assess a fee on a third-party merchant's attempt to collect a fee. Ex. 2.

87.    Defendant breaches its contractual promises when it charged fees in these circumstances.

**C. Plaintiff's Experience**

88.    As an example, on or around January 28, 2020, INTUIT PYMT SOLN attempted to collect a $0.50 TRAN Fee from Plaintiff Merritt Island Woodwerx LLC's account.

89.    Defendant paid that fee into purported overdraft and assessed Plaintiff a $30 fee for doing so, 60 times the amount of the fee.

90.    The improper fee charged by Defendant was not an error, but rather an intentional charge made by Defendant as part of its standard processing of items.

91.    Plaintiff therefore had no duty to report the fee as an error.

92.    Moreover, any such reporting would have been futile as Defendant had made a decision to charge fees in this specific manner to maximize profits at the expense of customers.

**CLASS ALLEGATIONS**

93.    Plaintiff brings this action individually and as a class action on behalf of the following proposed Classes:

> APSN Class: All consumers who, during the applicable statute of limitations, were Defendant checking account holders and were assessed an overdraft fee on a debit card transaction that

was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

Fee on Fee Class: All consumers who, during the applicable statute of limitations, were Defendant checking account holders and were assessed an overdraft fee or an insufficient funds fee on a third party merchant's attempt to collect its own fee.

Regulation E Class: All Defendant accountholders, during the applicable statute of limitations, were charged overdraft fees on transactions that did not overdraw a Defendant checking account.

Plaintiffs reserve the right to modify or amend the definition of the Classes as this litigation proceeds.

94.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

95.    The time period for the Classes is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

96.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

97.     The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all members of the Classes, were charged improper fees as set forth herein. The representative Plaintiffs, like all members of the Classes, have been damaged by Defendant's misconduct. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Classes. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Classes.

98.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

99.     Among the questions of law and fact common to the Classes include:

a.  Whether Defendant charged $30 OD Fees on APSN Transactions and $30 fees on fees;

b.  Whether this fee practice breached the Contract and the duty of good faith and fair dealing;

c.  Whether this practice unjustly enriched Defendant;

d.  Whether Defendant violated Regulation E;

e.  The proper method or methods by which to measure damages; and

f.  The declaratory and injunctive relief to which the Classes are entitled.

100.    Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions,

particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

101.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

102.  Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

103.  Plaintiffs suffer a substantial risk of repeated injury in the future. Plaintiffs, like all Class members, are at risk of additional improper fees. Plaintiffs and the Class members are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford

adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

## FIRST CLAIM FOR RELIEF
## Breach of Contract, Including Breach of the Duty of Good Faith and Fair Dealing
### *(On Behalf of Plaintiffs and the APSN Class)*

104.   Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

105.   Plaintiffs and Defendant have contracted for banking services, as embodied in Defendant's account documents. See Exs. 1-3.

106.   All contracts entered by Plaintiffs and the APSN Class are identical or substantively identical because Defendant's form contracts were used uniformly.

107.   Defendant has breached the express terms of its own agreements as described herein.

108.   Under Florida law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

109.   Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute

examples of bad faith in the performance of contracts.

110.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

111.    Defendant abused the discretion it granted to itself when it charged improper fees.

112.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

113.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

114.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiffs and other members of the APSN Class.

115.    Plaintiffs and members of the APSN Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

116.    Plaintiffs and members of the APSN Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

117.    Plaintiffs Inc and the members of the APSN Class are entitled to

injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

## SECOND CLAIM FOR RELIEF
### Breach of Contract, Including Breach of the Duty of Good Faith and Fair Dealing
### *(On Behalf of Plaintiff Merritt Island Woodwerx LLC and the Fee on Fee Class)*

118.   Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

119.   Plaintiffs and Defendant have contracted for banking services, as embodied in Defendant's account documents. See Exs. 1-3.

120.   All contracts entered by Plaintiffs and the Fee on Fee Class are identical or substantively identical because Defendant's form contracts were used uniformly.

121.   Defendant has breached the express terms of its own agreements as described herein.

122.   Under Florida law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

123.   Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

124.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

125.   Defendant abused the discretion it granted to itself when it charged improper fees.

126.   Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

127.   In these and other ways, Defendant violated its duty of good faith and fair dealing.

128.   Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiffs and other members of the Fee on Fee Class.

129.   Plaintiffs and members of the Fee on Fee Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

130.   Plaintiffs and members of the Fee on Fee Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

131.    Plaintiffs and the members of the Fee on Fee Class are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

132.    Plaintiffs incorporate by reference the preceding paragraphs.

133.    Plaintiffs, individually and on behalf of the Classes, assert a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiffs' breach of contract claim and applies only if the parties' contract is deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

134.    Plaintiffs and members of the Classes conferred a benefit on Defendant at the expense of Plaintiffs and members of the Classes when they paid improper fees.

135.    Defendant appreciated this benefit in the form of the substantial revenue that Defendant generates from the imposition of such fees.

136.    Defendant has accepted and retained such fees under inequitable and unjust circumstances.

137.    Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiffs and the members of the Classes and should be required to make restitution to Plaintiffs and members of the Classes.

### FOURTH CLAIM FOR RELIEF
### Violation of Electronic Fund Transfers Act (Regulation E)
### C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 *et seq*.))
### (On Behalf of Plaintiffs and the Regulation E Class)

138.    Plaintiffs incorporate by reference the preceding paragraphs.

139.    Defendant violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

140.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (*Id*.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).) To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the

financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

141.    The intent and purpose of this Opt-In Form is to "assist customers in understanding

how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

142.    Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which

meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. §

1005.17 because it misrepresents Defendant's overdraft practices, as discussed above.

143.    As a result of violating Regulation E's prohibition against assessing overdraft fees without obtaining affirmative consent to do so, Defendant has

harmed Plaintiffs and the Reg E Class.

144.   Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiffs and members of the Reg E Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

a.    Certification for this matter to proceed as a class action;

b.    Declaratory and injunctive relief;

c.    Designation of Plaintiffs as the Class Representatives and designation of the undersigned as Class Counsel;

d.    Restitution of all improper fees paid to Defendant by Plaintiffs and the Classes because of the wrongs alleged herein in an amount to be determined at trial;

e.    Actual damages in amount according to proof;

f.    Pre- and post-judgment interest at the maximum rate permitted by applicable law;

g.    Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

h.    Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs, by counsel, demands trial by jury.

Dated: June 7, 2023                    Respectfully submitted,

*/s/ Jake Phillips*
Jacob Phillips
Florida Bar No. 0120130
Normand PLLC
3165 McCrory Place
Suite 175
Orlando, FL 32803
(407) 603-6031
(888) 974-2175

Lynn A. Toops*
Cohen & Malad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 4204
Tel: (317) 636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch, IV*
Stranch, Jennings & Garvey, PLLC
223 Rosa L. Parks Ave. Ste. 200
Tel: (615) 254-8801
gstranch@stranchlaw.com

Christopher D. Jennings*
Johnson Firm
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Tel: (501) 372-1300
chris@yourattorney.com

*pro hac vice applications to be submitted*

*Counsel for Plaintiffs and the Proposed Classes*